1
2
3
4
5
6
7
8
9        IN THE UNITED STATES DISTRICT COURT

10       FOR THE NORTHERN DISTRICT OF CALIFORNIA

11              SAN JOSE DIVISION

12  Robert S. Zabala,                          NO. C 06-02810 JW

13              Petitioner,                    **ORDER GRANTING PETITION FOR
                                               WRIT OF HABEAS CORPUS; DENYING**
        v.                                     **WRIT OF MANDAMUS**
14
    Michael W. Hagee, et al.,
15
16              Respondents.
                                        /
17                          **I.  INTRODUCTION**

18          Petitioner Robert S. Zabala ("Zabala") brings this Petition for a Writ of Habeas Corpus and

19  for a Writ of Mandamus by a Person in Military Custody.  Zabala seeks discharge from the military

20  as a conscientious objector pursuant to 28 U.S.C. §§ 2241(a) & (c)(1) and 2243.  The Court

21  conducted a hearing on October 25, 2006.  Based on the papers submitted to date and the oral

22  arguments of counsel, the Court GRANTS Zabala's Petition for a Writ of Habeas Corpus.  The Court

23  DENIES the petition for a Writ of Mandamus as premature.

24                          **II.  BACKGROUND**

25  A.     **Factual Background**

26          On July 8, 2002, Zabala enlisted in the United States Marine Corps Reserves through the

27  Delayed Entry Program for a period of eight years.  (Declaration of Claire T. Cormier in Support of

28  Respondents' Opposition to Petitioner's Petitions for Writ of Habeas Corpus and for a Writ of

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

Mandamus by a Person in Military Custody Ex. A at 12, 59, hereafter, "A.R.," Docket Item No. 6.) Zabala was then eighteen years old.  Id.  By enlisting, Zabala continued a family tradition of military service; his grandfather, mother, father, uncles, and cousins had previously performed military service.  (A.R. 21.)

In September 2002, Zabala enrolled as an undergraduate student at the University of California at Santa Cruz.  (A.R. 17.)  He received tuition assistance based on his military status. (A.R. 33.)  In December 2002, during Zabala's one-year delayed entry period, his grandmother, his former guardian whom he regarded as a "second mother," had a stroke that left her paralyzed and unable to speak.  (A.R. 21.)  She died on March 17, 2003, three months before Zabala's scheduled departure for bootcamp.  Id.  Zabala withdrew from school for one quarter to mourn her death. (A.R. 21-22.)  He gave the eulogy at her funeral, which had a profound effect on him, as he described:

> When I stood up at the podium, I looked around and saw at least a hundred people in front of me.  Each of those people was connected to my grandmother in a web.  She helped many of them in their time of need and was considered to be the most compassionate person by many people.  Now that she passed away, the web lost one of it's [sic] brightest lights and sent an aftershock of sadness throughout it.  I thought that if one woman affected this many people, the loss of a hundred people would surely cause widespread despair.

(A.R. 22.)  Zabala looked to the Marine Corps as "a place where [he] could find security" and that would "serve as a temporary solution to [his] problems."  Id.

On June 17, 2003, Zabala began recruit training, or boot camp.  Id.  During his three months of boot camp, Zabala had five sets of experiences that helped to crystallize his realization that he was a conscientious objector to war.  Zabala's first set of experiences were with his series commander, Captain Sanchez ("Sanchez").  (A.R. 22-23.)  Sanchez repeatedly gave speeches about "blowing shit up" or "kicking some fucking ass," which caused Zabala to wonder "how someone could be so motivated to kill."  Id.  In August 2003, a fellow recruit committed suicide on the shooting range, to which Sanchez commented in front of the recruits, "Fuck him, fuck his parents for raising him, and fuck the girl who dumped him."  (A.R. 23.)  Zabala was "abhorred by the blood lust

2

[Sanchez] seemed to possess" and "completely dumbfounded that no one in the stands was stunned at [Sanchez's] comments."  Id.  Of that moment, Zabala states, "I realized that I was different than the rest of the men around me, that I had a different perspective and value of life than others."  Id.

The second set of events took place in August 2003.  Zabala's series was promised a "special treat" in the form of a "motivational clip" by an instructor.  Id.  The clip showed Iraqi corpses, explosions, gun fights, and rockets, set to a song with the lyrics, "Let the bodies hit the floor."  (A.R. 23-24.)  The clip caused Zabala to cry for the only time in boot camp; as he looked around, he saw his peers nodding their heads in time with the beat and smiling.  (A.R. 24.)

The third set of events took place when Zabala served as a guide throughout boot camp.  (A.R. 52.)  He felt that he had an "obligation to impart some sense of [his] personal integrity" to other recruits.  Id.  However, based on his conversations with them, he began to question his own motivation, because of the differences between his thinking and theirs.  Id.

The fourth set of events took place in October 2003, a month after Zabala graduated from boot camp.  Zabala overheard another Marine stating, "Hey man, check out all these dead body pictures I got over in Iraq."  (A.R. 24.)  Zabala later stated of the experience, "I was in a state of disbelief because it seemed to me that the pictures were a sort of trading cards."  Id.  After overhearing this conversation, Zabala felt that his belief in the "sanctity of life" was being tested by his remaining in the Marine Corps.  (A.R. 24-25.)

The fifth set of experiences took place after Zabala returned to school following boot camp.  In May 2004, Zabala had a conversation with a fellow Marine at his school, which concerned the mission of the United States military, the purpose of the Iraq War and its death toll, and the role of other nations in the world.  (A.R. 25.)  Following this conversation, Zabala's thoughts concerning his military service crystallized:

> I began to think about the thousands of people who died in the past year in war, who didn't die due to just one soldier or suicide bomber, but largely by an organization. This organization trains to kill human life.  This organization places mission accomplishment above human life.  An organization, as with any military, is to achieve victory in times of conflict by killing the enemy.  Every part of the Marine Corp [sic], be it Radio Operator to Food Preparation, participates to keep this organization moving along on it's [sic] mission to end human life . . . My actions as a

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Marine would surely aid in the process of ending human life and I would be forced to take responsibility for those that die due to the Marine Corp [sic]. I will not do this.

(A.R. 25-26.)

This realization impacted Zabala's civilian life in several ways. His appetite diminished and he consistently looked tired. (A.R. 28.) He began to experience migraines and sought medical treatment in May 2004. Id. He also spoke with a counselor. Id. He changed his course of study from computer engineering to literature, reasoning:

> I am . . . greatly interested in studying the stories of the human race, as each story usually involves a conflict. Different stories have different ways of solving conflict and by studying various works I can create a better understanding of my view of the world. My exploration as a student leads me to truly appreciate the works of all humans and the stories that they have to tell. Each person, each life, has a unique and special experience during their time on earth, they only require that someone listen. In future, I interest [sic] in becoming a high school teacher to use literature as an aid to show [sic] my beliefs with the next generation.

Id. During the 2003-2004 school year, Zabala began a routine of helping one less fortunate individual per week. (A.R. 27.) For instance, he would take a homeless person to eat at a restaurant or donate a warm jacket to someone who needed it. Id. Zabala now works to help two less fortunate people per week. Id. In April 2004, Zabala began visiting the Resource Center for Non-Violence in Santa Cruz, California and volunteering in the Center's counter-recruitment program. (A.R. 28, 32.)

During his three months in boot camp, Zabala began to attend Buddhist services. (A.R. 31.) Since leaving boot camp, he has not affiliated exclusively with Buddhism, but feels most comfortable with Buddhism. (A.R. 29.) He describes himself as "immersed in Buddhist literature," and has begun a routine of regular meditation. Id. He also engages in the Buddhist practice of folding cranes. (A.R. 34.) In his application for conscientious objector status, he cited the following three principles concerning participation in war:

> First Precept of Buddhism – "I will be mindful and reverential with all life, I will not be violent nor will I kill."

> "Victory breeds hatred. The defeated live in pain. Happily the peaceful live giving up victory and defeat."

4

"Hatreds never cease by hatred in this world; through love alone they cease.  This is an eternal law."

(A.R. 32.)

During his regular drill weekend of May 21-23, 2004, Zabala spoke to Company Inspector-Instructor First Sergeant McNeal about his objection to war.  (A.R. 12.)  Contemporaneously, he met with the 23rd Marine Regimental Chaplain, Lieutenant Commander Barber, to whom he explained that his Buddhism-influenced beliefs and conscience proscribed him from participating in war of any kind.  (A.R. 12, 33.)

**B.**  **Procedural History**

On June 25, 2004, Zabala submitted a written application for discharge from the Marine Reserves on the basis of conscientious objector status pursuant to Marine Corps Order (MCO) 1306.16E on June 25, 2004.  (A.R. 16-32.)  Zabala's written application described how his beliefs had formed after enlistment in the Marine Corps.  (A.R. 19.)  He stated that the military's mission is to prepare for combat (i.e. the taking of human lives) and that every position in the military, including non-combat jobs such as preparing paperwork or counseling soldiers, contributes to that mission.  (A.R. 26.)  He stated that his beliefs were in direct conflict with this mission and that he could not aid in preparation for war.  Id.

In support of his application, Zabala submitted four letters of reference.  Zabala's girlfriend described his internal struggle between fulfilling his duty as a Marine and his growing concern with the prospect of killing innocent people; she stated that she sincerely believed that he was firm and genuine in his personal beliefs.  (A.R. 37.)  Zabala's roommate described him as a considerate person who regretted joining the Marine Corps because he could not envision himself killing another person.  (A.R. 38.)  Zabala's mother described his childhood being spent in a broken home and her pride at his recent maturation.  She stated that Zabala had told her, "I don't believe in having to fight in a war since I realize it kills people needlessly."  (A.R. 39-40.)  Zabala's civilian employer wrote about the changes he had observed in Zabala throughout the preceding year and attributed them to Zabala's grandmother's death and Zabala's military experience.  He stated that Zabala had matured and viewed life differently, concluding: "Regardless of my own personal feelings about his personal

5

United States District Court

For the Northern District of California

1  life changes, I respect Robert for his strong beliefs because I know they are based on much soul

2  searching and are in accordance with his values."  (A.R. 42.)

3      Pursuant to MCO 1306.16E, Zabala was interviewed by two chaplains and a clinical

4  psychologist.  (A.R. 12.)  Chaplain Barber had previously met with Zabala on May 23, 2004, and

5  chronicled that meeting in a June 10, 2004 letter.  (A.R. 33.)  Barber noted that during the drill

6  weekend, Zabala could not even bring himself to shoot at a paper target.  Id.  Zabala told Barber that

7  the more he studied Buddhism, the more compelled he felt to follow Buddhist doctrines prohibiting

8  the taking of human life.  Id.  He stated that his aversion to killing had reached the point where he

9  could not kill.  Id.  Barber found Zabala to be "honest and sincere in his beliefs, which are in

10  harmony with his Buddhist faith."  Id.  Barber recommended that Zabala be administratively

11  separated from the Marine Corps.  Id.

12      Buddhist Chaplain Jeanette Shin interviewed Zabala on September 17, 2004.  (A.R. 34.)

13  Shin noted that Zabala was not a practicing Buddhist, and stated her opinion that Zabala was "not

14  basing his request [for conscientious objector status] on the basis of being a Buddhist, but more in

15  line with his own conscience against taking any life."  (A.R. 34-35.)  Shin advised Zabala that many

16  Buddhists choose to serve in the military and that it did not violate the tenets of Buddhism to serve

17  in a non-combatant capacity.  Id.  Zabala responded that he nonetheless was convinced of his

18  decision to seek Conscientious Objector status.  Id.  Shin concluded that Zabala was "sincere in his

19  decision to seek Conscientious Objector status," and recommended that his application be granted.

20  Id.

21      On November 29, 2004, Air Force clinical psychologist David Cordry examined Zabala.  He

22  found no psychiatric disorder warranting treatment and no character or personality disorder

23  warranting administrative action.  (A.R. 36.)  Cordry did not give an opinion on Zabala's request for

24  conscientious objector status.  Id.

25      At an unknown point after May 2004, Major R.D. Doherty, the commanding officer of

26  Zabala's platoon, interviewed him concerning his request for conscientious objector status.  (A.R.

27  43.)  Doherty asked Zabala why it had taken him so long to come to his decision after the events in

28

6

United States District Court

For the Northern District of California

1    boot camp took place.  Zabala was unable to provide a definitive answer, other than that he could

2    not continue.  Id.  Doherty asked Zabala about his faith and how long he had been practicing.

3    Zabala stated that he was not practicing, but rather, a believer in the faith; he could not cite specific

4    teachings.  Id.  Doherty stated:

> During [Zabala's] interview by the Investigating Officer I was contacted to render my thoughts on the matter . . . I stated that I was not convinced of LCpl Zabala's sincerity of his faith given that he did not actually practice.  I further stated that I questioned that if the incidents at Recruit Training had such a powerful influence in his decision, why had it taken him so long to finally report it.  I feel that this attempt at being classified as a Conscientious Objector is an attempt to be separated from the Marine Corps prior to the completion of his required service.

9    Id.

10    The Investigating Officer assigned to Zabala's case was Captain Michael P. McCready.

11    (A.R. 15.)  On January 11, 2005, McCready conducted a hearing with Zabala at the Marine Corps

12    Reserve Training Center in San Bruno, California.  (A.R. 10.)  At that time, McCready reviewed

13    Zabala's application, the recommendations of the chaplains and the psychiatrist, letters from

14    Petitioners' character witnesses, and a letter from Major Doherty.  Id.  Zabala was accompanied by a

15    non-attorney counselor, April Burns of GI Rights in Santa Cruz, California.  (A.R. 10-11, 44.)

16    Zabala declined to call witnesses and present additional supporting evidence, and waived his rights

17    to have the hearing recorded and have an attorney present.  (A.R. 10-11.)

18    During the hearing, Zabala explained his refusal to participate in the Marine Corps in any

19    capacity because of his personal inability to use violence or support an organized effort that uses

20    violence.  (A.R. 51.)  After questioning Zabala himself, McCready phoned Doherty and instructed

21    Doherty to ask questions of Zabala.  (A.R. 52.)  Doherty exclaimed, "What did you think you were

22    joining, the Peace Corps?  I don't know how anyone who joins the Marine Corps cannot know that

23    involves killing!"  Id.  Doherty stated, "I don't think that Zabala is sincere.  I don't think he can be a

24    conscientious objector but I don't think that he should be in the Marine Corps!  He should have to

25    pay back for his training, etc..."[1]  (A.R. 53.)  The hearing concluded with Zabala informing

26    _____

27    [1] Doherty also opined that Zabala was too far into his military career to claim conscientious objector status; he stated that Zabala should have mentioned his feelings prior to or at recruit

28    training.  (A.R. 45.)  He believed that Zabala chose to seek conscientious objector status when he did

7

McCready, "Sir, I want to make clear that I will appeal this [conscientious objector] claim if necessary until the Marine Corps understands that I am sincere in my convictions."[2]  Id.

Upon review of McCready's report, several levels of the Marine Corps command structure recommended that Zabala be granted 1-O conscientious objector status and separated from the Marine Corps.  (A.R. 6-7.)  The Commanding Officer of the 23rd Marine Regiment 2nd Battalion, Lieutenant Colonel P.K. Lebidine, stated in June 2005 that reassigning Zabala to a non-combat post would be "deemed inadequate" given Zabala's "personal statements, confused and exaggerated interpretations of past events at recruit training and those while at his current command."  (A.R. 9.)  Between June and October 2005, the Commanding Officer of the 23rd Marine Regiment, the Commanding General of the 4th Marine Division, and the Commander of the Marine Forces Reserve forwarded short letters recommending approval of Zabala's request for 1-O conscientious objector status.  (A.R. 6-8.)  On October 16, 2005, Zabala acknowledged receipt of the recommendation letters and stated that he did not have a rebuttal.  (A.R. 5.)

On December 2, 2005, a Conscientious Objector Status Screening Board convened at the United States Marine Corps headquarters to review Zabala's request for 1-O classification.  (A.R. 1.)  On December 16, 2005, Brigadier General R.S. Coleman, Commandant of the Marine Corps, prepared a report denying Zabala's application.  Id.  The Board found that Zabala had "failed to provide **clear and convincing** evidence to **demonstrate** that his stated opposition to war was founded on religious training or beliefs of the same strength and depth as found in traditional religious convictions, and that his professed belief in nonviolence was the primary controlling force in his life."  Id. (emphasis in original.)  Specifically, the Board held that Zabala had "only provided statements from friends that show he is a kind person" and that "his claim that changing his college major indicates the affect [sic] of his new religious beliefs" was not significant.  (A.R. 2.)  The

_____

because of the prospect that his company would be activated to participate in combat operations in support of Operation Iraqi Freedom III and the ongoing Global War on Terrorism.  Id.

[2]  The account in the Administrative Record of Zabala's hearing is taken from the notes of April Burns.  McCready requested her notes via an email to Zabala dated January 12, 2005.  (A.R. 55.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  Board also found that Zabala had failed to substantiate his claims to commit weekly acts of kindness

2  for homeless people.  (A.R. 3.)

3       On April 12, 2006, Zabala filed this Petition for a Writ of Habeas Corpus and for a Writ of

4  Mandamus, challenging military custody and contending that his claim for conscientious objector

5  status was wrongfully denied.  (See Docket Item No. 1.)

6       As a preliminary matter, the Court DENIES Zabala's petition for Writ of Mandamus as

7  premature.  There is no showing that Respondents have failed to carry out a mandating duty.  28

8  U.S.C. § 1361; see also Patel v. Reno, 134 F.3d 929, 931-2 (9th Cir. 1998).

9                                **III.  STANDARDS**

10 **A.      Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241(c)(3)**

11      A federal court may grant a writ of habeas corpus to a person who is "in custody in violation

12 of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  A member of

13 the armed forces who has (1) applied for discharge as a conscientious objector and (2) has exhausted

14 all avenues of administrative relief may seek habeas corpus relief in a federal district court if the

15 military's denial of his conscientious objector application had no basis in fact.  Parisi v. Davidson,

16 405 U.S. 34, 35 (1972).

17      However, judicial review under the basis in fact test is the "narrowest review known to the

18 law."  Taylor, 601 F.2d at 1103.  The reviewing court "does not weigh the evidence for itself or ask

19 whether there is substantial evidence to support the military authorities' denial of the applicant's

20 request for conscientious objector status."  Id.  Indeed, the court must "search the record for some

21 affirmative evidence" to support the authorities' overt or implicit finding that the applicant "has not

22 painted a complete or accurate picture of his activities."  Id.  "Put another way, the reviewing court

23 should look for 'some proof that is incompatible with the applicant's claims.'"  Id.

24 **B.      Conscientious Objector Status**

25      Discharge of conscientious objectors from military service is not constitutionally or

26 statutorily required.  Sanger v. Seamans, 507 F.2d 814, 817 (9th Cir. 1974).  Nonetheless,

27 Department of Defense regulations acknowledge a "national policy to recognize the claims of bona

28

1   fide Conscientious Objectors in the Military Service" by providing for administrative discharge of

2   conscientious objectors and relief from, or restriction of, military duties to the extent practicable and

3   equitable.  Department of Defense Directive (DODD) 1300.6 ¶ 4.1.

4        The Department of Defense defines conscientious objection as a "firm, fixed and sincere

5   objection to participation in war in any form or the bearing of arms, by reason of religious training

6   and belief."  DODD 1300.6 ¶ 3.1.  There are two classes of Conscientious Objectors: Class 1-O and

7   Class 1-A-O.  A Class 1-O Conscientious Objector is a "member who, by reason of conscientious

8   objection, sincerely objects to participation of any kind in war in any form."  DODD 1300.6 ¶ 3.1.1.

9   A Class 1-A-O Conscientious Objector is a "member who, by reason of conscientious objection,

10  sincerely objects to participation as a combatant in war in any form, but whose convictions are such

11  as to permit a [sic] Military Service in a non-combatant status."  DODD 1300.6 ¶ 3.1.2.  An

12  applicant who claims 1-O status must not be granted 1-A-O status as a compromise.  DODD 1300.6

13  ¶ 5.5.

14       An applicant may be granted conscientious objector status (1) who is conscientiously

15  opposed to participation in war in any form; (2) whose opposition is founded on religious training

16  and belief;[3] and (3) whose position is sincerely and deeply held.  DODD 1300.6 ¶ 5.1.1.  The

17  applicant's objection to war must have crystallized after he enlisted.  DODD 1300.6 ¶ 4.1.1.

18       **1.       Prima Facie Case**

19       The applicant has the initial burden to assert a prima facie claim, which requires three

20  showings by clear and convincing evidence: (1) opposition to war in any form (2) that is based on

21

22  ───────────────

23       [3] "Religious training and belief" refers to (1) belief in an external power or being or (2) a
    deeply held moral or ethical belief, to which all else is subordinate or upon which all else is

24  ultimately dependent, and which has the power or force to affect moral well-being.  "The external
    power or being need not be of an orthodox deity, but may be a sincere and meaningful belief that

25  occupies in the life of its possessor a place parallel to that filled by the God of another, or, in the
    case of deeply held moral or ethical beliefs, a belief held with the strength and devotion of

26  traditional religious conviction.  The term "religious training and belief" may include solely moral or
    ethical beliefs even though the applicant himself may not characterize those beliefs as "religious" in

27  the traditional sense, or may expressly characterize them as not religious.  The term "religious
    training and belief" does not include a belief that rests solely upon considerations of policy,

28  pragmatism, expediency, or political views."  DODD 1300.6 ¶ 3.2.

**United States District Court**

For the Northern District of California

1    religious training and belief and (3) is sincere.  DODD 1300.6 ¶ 5.4; MCO 1306.16E ¶ 4.b; 32

2    C.F.R. § 75.5; <u>Taylor v. Claytor</u>, 601 F.2d 1102, 1103 (9th Cir. 1979).

3        **2.    Basis in Fact for Denial**

4        Once an applicant has established his prima facie case, he will be granted conscientious

5    objector status unless the government establishes a rational basis in fact for denying his application.

6    MCO 1306.16E ¶ 4.b.  Mere suspicion or speculation as to an applicant's motivation does not

7    constitute a basis in fact.  <u>Dickinson v. United States</u>, 346 U.S. 389, 397 (1953).  The government

8    must present proof that is incompatible with the applicant's claim.  <u>Roby v. U.S. Dept. of the Navy</u>,

9    76 F.3d 1052, 1058 (9th Cir. 1996) (quoting <u>Woods v. Sheehan</u>, 987 F.2d 1454, 1456 (9th Cir.

10   1993)).

11                  **IV.  DISCUSSION**

12       It is undisputed that Zabala has standing to pursue his petition before the Court, and has

13   exhausted all administrative remedies that the military provides.  At the hearing, the government

14   conceded that Zabala has made his prima facie showing.  However, for the sake of completeness, the

15   Court examines whether Zabala has established a prima facie case.

16   **A.    Prima Facie Case**

17       The first issue is whether Zabala established a prima facie case that he was a 1-O

18   conscientious objector.[4]

19       **1.    Opposition to War in Any Form**

20       Zabala's firm opposition to war in any form is well-established and undisputed.  (<u>See, e.g.</u>

21   A.R. 25-26, 32-35.)  The Court finds that Zabala has satisfied the first element of a prima facie case

22   of conscientious objection to war.

26   _____

27       [4]  (Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus
     and Writ of Mandamus at 12-16, hereafter, "Petition," Docket Item No. 3; Respondents' Opposition
28   to Petitioner's Petitions for Writ of Habeas Corpus and for a Writ of Mandamus by a Person in
     Military Custody at 13-17, hereafter, "Opposition," Docket Item No. 6.)

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

### 2.      Based on Religious Training and Belief

For an applicant to demonstrate that his moral and ethical beliefs are against participation in war in any form and are held with the strength of traditional religious convictions, the applicant must show that his moral convictions have directed his life in the way traditional religious convictions of equal strength, depth, and duration have directed the lives of those whose beliefs are found in traditional religious convictions.  DODD 1300.6 ¶ 5.3.1.  In other words, the applicant's belief must be the primary controlling force in his life.  Id.

Zabala has demonstrated that his moral and ethical beliefs are against participation in war in any form and are held with the strength of traditional religious convictions—i.e., as the primary controlling force in his life.  Much as a traditionally religious person might, Zabala has three core, guiding principles by which he lives.  (A.R. 32.)  In his case, the three principles are influenced by the Buddhist religion, although he does not identify as a practicing Buddhist.  (A.R. 29.)  In response to his newly acquired belief system, Zabala made several life changes, much as someone who had recently adopted or converted to a new traditional religion might do.

Specifically, based on his belief that participation in an organization that "trains to kill human life" and "places mission accomplishment above human life" is wrong, Zabala began participation in counter-recruitment efforts, notwithstanding the risk that he would face military discipline for his actions.  (A.R. 25-26, 28, 32.)  He changed his major to English, based on his hope that it would educate him in "different ways of solving conflict" (A.R. 28) – thus reducing the necessity of military warfare.  He began to seek new ways to help the less fortunate.  (A.R. 27.)  Further, he has begun engaging in spiritual practices that are linked to the Buddhist religion, and to his pacifist moral and ethical belief system.  (A.R. 29, 34.)  Lastly, Zabala sought medical treatment, including counseling and medication for migraines, to address the strain caused by the conflict between his beliefs and his military service.  (See A.R. 25-26, 28.)

The Court finds that Zabala has established the second element of his prima facie case.

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court

For the Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.      Sincerity

Zabala's professed beliefs, coupled with the above-described actions, are indicative of sincerity.  The Court finds that Zabala has established the third element of his prima facie case.

Since Zabala has made out a prima facie case for classification as a 1-O conscientious objector, the Court considers whether Respondents have identified a basis in fact to deny his conscientious objector application.

### B.      Basis in Fact for Denial of Conscientious Objector Status

The parties dispute whether Respondents identified a basis in fact to deny Zabala's conscientious objector application.  Under this test, Respondents must establish a rational basis in fact *that is incompatible with Zabala's claim* in order for the Court to deny Zabala's conscientious objector status.  Dickinson, 346 U.S. at 397; Roby, 76 F.3d at 1058 (emphasis added).  The Court considers each of Respondents' bases in turn.

### 1.      Vocational Focus

Respondents contend that Zabala's decision to change his vocational focus from computer engineering to literature does not "[reflect] the evolution of his moral convictions."  Rather, Respondents contend, Zabala's roommate stated that Zabala switched majors because "he could no longer bring himself to go to his classes because his disdain for them is so strong."  (Opposition at 10.)

In fact, Zabala's roommate's statement is not incompatible with Zabala's claim.  Zabala explained that he wished to major in English to (1) study the stories of the human race in order to elucidate sources of conflict; (2) appreciate the works of all humans and the stories they have to tell; and (3) become, ultimately, a high school teacher of literature and share his beliefs with the next generation.  It is consistent with Zabala's compelling reasons for his change in major that his "disdain" for his computer engineering classes became strong.  The Court finds that  Zabala's roommate's testimony does not serve as a basis-in-fact for denial of conscientious objector status, because Respondents have not shown that it is actually inconsistent with Zabala's claim.

### 2.    Efforts to Help Others

Respondents contend that Zabala's recent efforts to help others do not qualify as a way in which Zabala's lifestyle has changed as a result of his beliefs.  This is because, according to Respondents, Zabala also helped his grandmother at her care home and performed sixty hours of community service during his senior year in high school, prior to his enlistment.  (Opposition at 10.)

Zabala's current efforts to help others take the form of reaching out to two less fortunate people per week; for instance, by providing food or warm clothing.  There is no evidence that these efforts relate back to his caring for his grandmother or his performance of community service in high school (which consisted of very different activities, such as public concerts, fundraising for non-profit organizations, or cleaning up around his local neighborhood.)  (A.R. 30.)  A contrary finding would mean that no military enlistee who performed any community service in high school could cite his unrelated efforts to help others years later as evidence of an evolution in his beliefs.

The Court finds that Zabala's high school community service cannot be a basis in fact for denial of his application for conscientious objector status, because Respondents have not shown that his previous community service is actually inconsistent with his claim.

### 3.    Statements Regarding Practice of Buddhism

Respondents contend that Zabala made conflicting statements as to the basis for his beliefs.  First, he told Major Doherty and Regimental Chaplain Barber that he belonged to the Buddhist faith and that actions that harmed human life violated his faith.  In contrast, when Zabala spoke to Chaplain Shin, he admitted that he was not a practicing Buddhist, but became interested in Buddhist teachings after reading books by Buddhist writers.  (Opposition at 10.)

In Taylor v. Claytor, 601 F.2d 1102 (9th Cir. 1979), the Ninth Circuit considered the case of an applicant whose radically conflicting statements could not form the basis for conscientious objector status.  In October 1975, the applicant stated that he could not "support military intervention in no-win wars, U.N. police actions, and similar endeavors," but that he would "immediately respond to a summons to protect our sovereign shores and borders from an imminent threat from without."  Id. at 1103.  Three months later, in January 1976, the applicant stated that

United States District Court

For the Northern District of California

"[o]ver the past two years," he had reached "the unalterable belief that, for reasons of conscience, I cannot participate in war or in the military in any form, in any reason, for whatever capacity." Id. The Ninth Circuit found a basis in fact to deny his application:

> The inconsistent declarations caset serious doubt on the validity of appellant's contention that he satisfied the Gillette requirement of opposition to war in any form. We are unpersuaded by appellant's attempt to explain away the inconsistencies by claiming that his antiwar beliefs did not crystallize until after October 15, 1975. That assertion is flatly contradicted by the January 3, 1976 application which said that Taylor's views about war had formed over the past two years.

Id. at 1103-04.[5]

In this case, Regimental Chaplain Barber described his exchange with Zabala as follows:

> He said he belonged to the Buddhist faith, and that the more he studied the teachings of his religion, the more he felt compelled to follow its doctrines prohibiting the taking of human life. He said he first had some reservations while in boot camp, and his aversion to killing human beings had now developed to the point that he could not do it.

(A.R. 33.)  Chaplain Shin stated:

> During my interview, LCPL Zabala admitted that he was not, at the present time, a practicing Buddhist. He does not belong to any particular tradition, or attends temple. He stated that he became interested in the Buddhist teachings as a result of reading several books by Buddhist writers, which were provided for him by a non-violence center (a secular group) he visits in Santa Cruz, CA. He stated that he feels "closest to Buddhism" out of all the religions. He does [sic] several individual Buddhism-related practices, such as meditation, and folding cranes, which he states helps him with his current problems . . . It is my opinion that LCPL Zabala is not basing his request on the basis of being a Buddhist, but more in line with his own conscience against taking any life.

(A.R. 34-35.)  Lastly, Major Doherty stated, "I then asked him about his faith and how long he had been practicing. He stated that he was not practicing just a believer in the faith [sic] and could not really cite any specifics about what its teachings were." (A.R. 43.)

None of these descriptions substantively conflict with Zabala's own words. He provides two complementary explanations of his beliefs in his application for conscientious objector status. First,

---

[5] See also Frey v. Larsen, 448 F.2d 811 (9th Cir. 1971), in which the applicant stated that he might be willing to participate in a noncombatant role in a defensive war if the United States was under attack. Id. at 814. This conflicted with the applicant's present objection that he could not participate in war in any form. Id. The court held that the conflict between the applicant's statements could serve as a basis in fact for denial of conscientious objector status.

15

United States District Court

For the Northern District of California

he stated: "I find myself immersed in spiritual literature and will continue on my spiritual process and development.  While I have not defined myself to one set of beliefs, I feel more comfortable with the Buddhist religion.  I am also establishing a routine of meditating in nature."  (A.R. 29.)  Second, he stated: "Applicant first attended [Buddhist] service[s] in boot camp and made a conscience [sic] decision to affiliate with the religion."  (A.R. 31.)  Zabala went on to cite three tenets of Buddhism as relevant beliefs for him.  (A.R. 32.)

Accordingly, Zabala considers himself to have "affiliate[d]" with Buddhism, the religion with which he most closely identifies, although he has not "defined himself to one set of beliefs."  In Zabala's worldview, he distinguishes between being a *practicing* Buddhist and living according to the Buddhist-influenced principles.  There is no conflict between these two statements.  It is undisputed that an individual may have a belief system which is held with the strength of traditional religious convictions without being a formal member of a particular church, synagogue, or temple.  In contrast to the applicants in <u>Frey</u> and <u>Taylor</u>, Zabala has not made conflicting statements that call into question the sincerity of his opposition to all forms of war.

The Court finds that Zabala's statements about his Buddhism-influenced belief system cannot serve as a basis in fact for denial of his application, because Respondents have not shown that any of his statements are inconsistent with his claim.

### 4.     Objective Manifestation of Beliefs

Respondents contend that objective indicia of Zabala's beliefs are lacking because there is no evidence that Zabala ever attended Buddhist services following boot camp.  In a conversation with Major Doherty, Zabala was unable to cite any specifics of the Buddhist faith.  Also, though Zabala included Buddhist precepts in his application for conscientious objector status, he could not identify any specific Buddhist teachings when asked in an interview.  (Opposition at 11.)

In <u>Roby v. U.S. Dept. of the Navy</u>, 76 F.3d 1052 (9th Cir. 1996), the Ninth Circuit held that the applicant's failure to identify objective changes in his lifestyle could serve as a basis in fact for denial of his application:

> His beliefs are based only on his reading two or three books and watching two television documentaries.  He does not plan to study further ("the time of book study

16

is over for me").  The only change in lifestyle that he foresees (other than leaving the military) is possibly to write letters for Amnesty International on behalf of other conscientious objectors.  If discharged, he plans to study photography . . . These factors could reasonably persuade an individual to question how deeply Roby holds his convictions.

Id. at 1058-59.

The Court has already found that Zabala has presented a prima facie case for conscientious objector status.  In order to establish his prima facie case, he had to show by clear and convincing evidence that his sincere opposition to war was based on *religious training and belief*.[6]  Put differently, Respondents' contention that objective indicia of Zabala's beliefs are lacking itself has no factual basis, and thus cannot be a ground for denial of Zabala's application for conscientious objector status.

**5.     Timing**

Respondents contend that Zabala's delay in mentioning his moral conflict to any commanding officers suggests that his convictions were not of such depth or strength as to prevent him from fulfilling his military duties, and that his convictions were not the primary controlling force in his life.  (Opposition at 12.)

It is well-established Ninth Circuit law that a delayed but timely filing of a conscientious objector application does not, standing alone, provide a sufficient factual basis to support a finding of insincerity.  Christensen v. Franklin, 456 F.2d 1277, 1278 (9th Cir. 1972).  On the other hand, a delayed filing can be one of the objective facts casting doubt on the sincerity of an applicant for conscientious objector status.  Id.

---

6 In this case, Zabala does not base his claim for conscientious objector status on being a member of the Buddhist faith, so he need not support his application with evidence of Buddhist religious observance.  Rather, he has based his claim on his belief system regarding non-violence, and he has presented evidence in support of that belief system, in contrast to the applicant in Roby.  For instance, his volunteer work at the Resource Center for Non-Violence in Santa Cruz corroborates his belief in the principle, "Victory breeds hatred.  The defeated live in pain.  Happily the peaceful live giving up victory and defeat."  His work to reach out to needy individuals corroborates the principle, "Hatreds never cease by hatred in this world; through love alone they cease.  This is an eternal law."  Further, his reason for changing majors to English—to better understand and avoid conflict—corroborates the principle, "I will be mindful and reverential with all life, I will not be violent nor will I kill."

United States District Court

For the Northern District of California

1    The Court has already found inadequate Respondents' other bases for denying Zabala's

2    application.  Accordingly, Zabala's application cannot fail based on its timing alone.  However, the

3    Court nonetheless considers Respondents' timing argument.

4        Courts within the Ninth Circuit have repeatedly held that it is legitimate for an applicant's

5    beliefs necessitating conscientious objector status to crystallize or mature over a period of time.[7]  For

6    instance, in Tressan v. Laird, 454 F.2d 761 (9th Cir. 1972), petitioner completed his medical

7    internship in 1967 and accepted a commission as a lieutenant in the Naval Reserve Marine Corps.

8    In July 1970, he underwent two weeks of training in weapons, weapon firing, and firing tactics.  Id.

9    In November 1970, he was notified to report for duty in Vietnam.  Id. at 761-62.  He began

10   preparing his application for conscientious objector status that same month.  Id.  In his application:

11       He narrated his religious training, some of his family experiences, his increasing
         conflict over his duty and his conviction against all killing (particularly arising during
12       his treatment of severely injured military personnel and during his training in
         weaponry), and finally the resolution of his conflict by filing his application . . .
13       Many letters from military associates, long-standing friends, his Rabbi, and the
         Chaplain who interviewed him were filed in support of his application.  The various
14       letters corroborated his narration.  All of the writers expressed the view that Tressan
         was deeply committed to his conscientious convictions.
15

16   Id. at 762.  The Chief of Naval Personnel ("CNP") denied the petitioner's application, finding that

17   his "sudden crystallization" of his beliefs was unacceptable.  Id.  Rather than the application being

18   the "direct result of deeply felt moral, ethical, or religious prohibition against war in any form," the

19   CNP found that it was a "negative response to an undesirable assignment."  Id.  The Ninth Circuit

20   reversed the CNP's denial, holding:

21       [T]he file reveals a prolonged effort on Tressan's part to reconcile his increasing
         pangs of conscience with his concept of the demands of military duty.  The lateness
22       of crystallization under these circumstances is not an indication of insincerity.  [The
         CNP's] conclusion . . . is not supported by the record unless we were to hold that no
23       one who applies for conscientious objector status after receiving orders to combat can
         be deemed sincere, and therefore, a finding of insincerity can be based on that fact
24       alone.  We decline to so hold.  Indeed, we think that it is consistent with sincerity that
         an officer would try to find some way to reconcile the demands of duty with the
25       demands of conscience in such a fashion that both might be respected and that he

26

27       [7] See also Chamoy v. Schlesinger, 371 F. Supp. 685 (D. Haw. 1974); Frisby v. Larsen, 330
28   F. Supp. 545 (N.D. Cal. 1971).

United States District Court

For the Northern District of California

would postpone repudiation of his military duty until it became clear that its demands made reconciliation impossible.

Id. at 762-63.

Similarly, in this case, Zabala has presented a timeline of "increasing pangs of conscience," beginning with his time in boot camp in mid-2003, and culminating in May 2004 with his crystallized realization after a debate with a fellow Marine:

> I began to think about the thousands of people who died in the past year in war, who didn't die due to just one soldier or suicide bomber, but largely by an organization. This organization trains to kill human life.  This organization places mission accomplishment above human life . . . Every part of the Marine Corp [sic], be it Radio Operator to Food Preparation, participates to keep this organization moving along on it's [sic] mission to end human life . . . My actions as a Marine would surely aid in the process of ending human life and I would be forced to take responsibility for those that die due to the Marine Corp [sic].  I will not do this.

(A.R. 25-26.)  It is consistent with Zabala's sincerity as a conscientious objector that he struggled for months to "reconcile the demands of duty with the demands of conscience" before accepting at last that for him, the two were irreconcilable.[8]

The Court finds that the timing of Zabala's application cannot be a basis in fact for denial of conscientious objector status, because Respondents have not shown that the timing is actually inconsistent with Zabala's claim.

---

[8]  Major Doherty speculated that Zabala may seek through his application for conscientious objector status to avoid the possibility of being mobilized for conduct in Iraq. (A.R. 45.)  However, there is no evidence in the record that Zabala's application was motivated by a desire to avoid the Iraq War.  Nor is there evidence that Zabala was actually facing the imminent prospect of serving in Iraq.  In Tressan, the Ninth Circuit accepted an otherwise-supported application for conscientious objector status even after the applicant had been ordered to overseas duty in Vietnam.  Thus, any unsupported speculation about Zabala's desire to avoid the Iraq War cannot serve as a basis in fact to undermine Zabala's well-supported application for conscientious objector status.  See Dickinson, 346 U.S. at 397.

19

**V.  CONCLUSION**

The Court GRANTS Zabala's Petition for a Writ of Habeas Corpus.  The Court DENIES Zabala's Petition for a Writ of Mandamus.

The United States Marine Corps shall discharge Robert S. Zabala as a conscientious objector by granting him Class 1-O status pursuant to Department of Defense Directive and pursuant to 28 U.S.C. §§ 2241(a) & (c)(1).  Zabala shall be discharged within **fifteen days** of the date of this Order. Within **twenty days** of the date of this Order, Respondents must also file a notice with the Court confirming the date on which Zabala was discharged.

Dated:  March 29, 2007

_____

JAMES WARE
United States District Judge

United States District Court
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Claire T. Cormier claire.cormier@usdoj.gov
Stephen L. Collier steve@thclinic.org

**Dated:  March 29, 2007**                                    **Richard W. Wieking, Clerk**


                                                            **By:   /s/ JW Chambers                    **
                                                                  **Elizabeth Garcia**
                                                                  **Courtroom Deputy**

**United States District Court**
For the Northern District of California